Mr. Smith. Thank you, Your Honor. May it please the court, good morning. I believe that this is an appeal from a grant of a summary judgment motion to the lower court and I believe that there is one underlying procedural matter that bears mention as we analyze the obviousness issue in the moment and that is the nature of the motions as related to the invalidity claim. The defendant's motion in the underlying, in the summary judgment motion was solely related to the inadmissibility of two experts that the plaintiff had brought forth. There was no discussion whatsoever and in fact the word obviousness is not contained within plaintiff's summary judgment motion with the sole exception of the inclusion of a site on a tangential issue. Other than that, the issue of obviousness is not contained whatsoever. The sole issue was the defendant said plaintiff's invalidity claim should be dismissed because your experts are not admissible. Of course, as to this claim that begs the question whether or not expert testimony is even necessary as to this common sense analysis. Nonetheless, the district court judge chose instead to not reach the conclusion as it relates to the admissibility of the experts and instead Sua Sponte rendered a decision on the issue of ordinate, or excuse me, obviousness and as part of that issue then said you haven't produced sufficient evidence. And simultaneously, while not reaching the conclusion as to the admissibility of the experts said I'm not going to give that the experts testimony anyway. What point are you trying to make that the district court judge didn't have the authority to grant summary judgment on obviousness because it wasn't included in the motion, is that? Absolutely, one, because two of the biggest things here are one, the trial court is saying that not sufficient evidence was put forth as to obviousness and the same is being mimicked now at the appeal level. But let me go forth and talk about the evidence that we did submit on the issue of obviousness and more specifically, our allegation that the district court used the wrong standard. In this case, we understand that the sole difference between those products that PennDOT was using as we discovered during this case, which encompassed every single claim with the exception of the addition of a powered conveyor. So the powered conveyor becomes the only issue that we analyze whether or not that was obvious. And so if we take the KSR issues of whether it was obvious to try, that means obvious to try moving from a roller conveyor to a power conveyor, whether the results were expected or unexpected, and whether there was a reasonable expectation of success. I think it's very clear that to anyone, much less someone skilled in the arts, you would say that moving from a roller conveyor to a power conveyor is absolutely obvious. There is nothing there. I understand the argument you're making, which is one you made in the brief sort of hanging on to this common sense notion. That's a little inconsistent, it seems to me, with the position you were making at the threshold. I mean, I don't see where there's a factual dispute here. I mean, even taking your argument, it seems to me what you're pressing for is for summary judgment of invalidity based on the common sense notion that there was nothing new in the invention. And there's no factual dispute about what it was or so forth, right? Certainly. I guess step one would be we would like to have been able to submit every bit of evidence as to obviousness had that issue ever come up. But two, absolutely, had we moved for that, we think that... Where's the evidentiary dispute? I mean, under your theory, it seems to me there is no dispute. The evidence isn't disputed. You're just kind of saying as a matter of law or under common sense or whatever, this patent fails. That's your view. They obviously don't share it. Absolutely, we would agree. But at the very minimum, we think that that's an issue that would go to the fact finder. We don't think that it's so uncontroverted that it doesn't meet that level of proof. Mr. Smith, the use of conveyors goes back to the 80s or so, doesn't it? Oh, I think Mr. Barnes, the inventor, said it went back 75 years. Okay, 75 years, and yet the first use of a power conveyor is 75 years later. What is the... If it was so obvious, why wasn't it done at least 50 years ago or 20 years ago? I suspect that has more to do with when sealant melters came into being as opposed to when conveyors came into being. We're talking about a combination of a conveyor with a sealant melter. Okay, and that goes back at least the 80s, doesn't it? Certainly, certainly, which is when... That's more than 30 years ago. Why wasn't it done? We certainly had power conveyors for years. We've had sealant conveyors for years. Why does it take somebody 30 years to do it if it's so commonsensical and so obvious and so clear and so lucid? I think I would say it maybe took 10 years for them to figure that, but I think... Even 10 years, if it's so obvious. Why does it take somebody 10 years to come up with it? I can't tell you that, but I can tell you that in this case... Well, don't you need to tell me that? No, I don't think so. Because in this case, the person that came up with that was Pennsylvania Department of Transportation. They were the ones, as you can see in the October 3rd and the November 6th letters from Mr. Kelly, they were the ones that said, Hey, put a powered conveyor to this. When you throw common sense at me and then say it takes them 30 years to come up with the common sense, there's a little bit of a disconnect there. I think you need to give me something more. Well, Your Honor, I think that this is maybe a perfect example of the evidence of ordinariness that would have been nice to have been allowed to put forth in the underlying action. That issue may be the result of the fact that there's been a change in the way the sealant product itself would be delivered. Maybe it's that you recall that the conveyor uses or is based upon blocks of sealant. I wish you weren't conjecturing. I wish you had an answer for me there. Absolutely, Your Honor. And I think that if we were in the underlying action, the issue of obviousness was being set forth, I think that that would all be part of affidavits that were set forth in the case. Mr. Smith? Yes. Did you file any cross motions? We did not. We did not. So you relied basically upon the other side to file the summary judgment motion. You did not object to it except for the fact that the factual determination had to be made at a trial. We challenged the various issues on many different theories, but we didn't make a cross motion for summary judgment at that point. No. If it's so commonsensical, why not?  Obviously, the issue of obviousness still becomes a jury question. There's no facts in dispute? Well, as we started this case, the facts were absolutely in dispute because, as you recall, they asserted that they invented the product from whole cloth, and it was only during discovery that we found out that no, in fact, the Pennsylvania Department of Transportation was the one that invented the product in the first place. There was no dispute as to what, once the information comes out, there's no dispute about what PennDOT is doing or has done or so forth, right? Is that all? Not anymore. I think we've sufficiently proved it to the opposition that they have abandoned that, which is why they abandoned their attempt to protect claim number one, which is the independent claim here. That comes back to Judge Gaiar's question. Once you've got the PennDOT information in the record, why don't you move for summary judgment? I think that was just simply a legal decision. I'm not sure that our reasoning, whether right or wrong, bears any relevance. Well, but you're trying to convince us that this is all commonsensical, and yet everybody's acting very differently. They aren't acting like this is an open and shut commonsensical case. I would disagree. I mean, I would say that it's exceedingly common sense that we're simply substituting a powered conveyor for one that was gravity-fed. And that is the use of a conveyor in all sorts of mechanisms has been used forever. But as Chief Judge Rader said, if it's so common sense to do it, it took a while for someone to figure it out. To change the gravity feed to a power conveyor belt feed. It certainly didn't. It's not a big field, Your Honor. I mean, we're talking about two or three companies in the whole industry. Well, does that make the time period in which the conversion was determined to be in advance a common sense issue? No, personally, I don't think the time period plays any real role in this matter. I think what is significant is the change from, what is the significance of the change from rollers to power? Is that somehow a new invention? Is that something that was completely unexpected? We all know the function of a roller conveyor, and it's exactly the same as the function of a motorized conveyor. It can either be electric or diesel or gas, but the function is exactly the same. And I see that I'm into my... Thank you. We'll preserve the rest of your rebuttal time. Mr. Anheuser? Yes, Your Honor. Thank you. May it please the Court, the District Court's judgment in this case should be affirmed. We discussed already just the obviousness portion. Well, let's stick with that a second. You just add a motor to a conveyor, and that's supposed to be a patentable invention? Your Honor, if I may, the context of this argument should be understood before we get into that point, which I will address. This issue was raised when, after discovery had gone on for about a year in this case, the only explanation that we had received for why our claims were invalid, and at that point we were asserting 4, 5, and 23, the only thing we had seen from the party here was an expert report from Mr. Mertiz. It's in the appendix at 222, and it's just a rambling statement about how everything in this patent is old, and just the conclusion that, therefore, the claims are obvious. It doesn't discuss the asserted claims. It doesn't attempt to tie any of these things together. I believe that opinion itself would not be admissible under the standards that have been set forth for expert opinions in obviousness cases. So our motion said, we believe, we don't know, but we believe that your only evidence of obviousness seems to be this report, which is nothing but conclusions. We never, so we file our motion. In response, as the district court pointed out, there was just, I believe, two sentences in the opposition. This is on page 21 of the appendix. All they said was, the inventor, David Barnes, identified any number of instances of prior art which incorporated the limitations of the 375 patent. Just the entire patent, no attempt to discuss the claims at issue. And then they say, these prior sales and uses render the patent invalid under the doctrine of obviousness. That's the only response that we got to explain what their case was. So for that reason, the issue of whether the limitations of the particular claims were asserted, that was never reached. The argument never got that far. But the judge seemed, in his opinion, to really go deeply into the issue of obviousness. That's correct, Your Honor. Citing the KSR factors and determining whether or not it would be common sense. Your Honor, and I believe that was correct. I believe that the district court identified the standard and addressed it correctly. But if the appellate in this case— No, Your Honor. It's not that obviousness wasn't raised. It's just that usually, obviousness is in the context of a particular claim. There's an argument that the elements of a particular claim are found in the prior art. Or if not, that the combination is obvious. Absolutely, Your Honor. I believe that the portion of their brief that I just read from did so. But if you look at the claims of this patent— It seems a little ironic that your 11-page brief to us is now being— You're criticizing the other side for giving a very cursory presentation when I've never seen a more cursory one than the one you gave. Your Honor, I'm not criticizing the other side for a cursory presentation. The only—what I am saying is we have never seen an element-by-element analysis of a specific claim from the appellant. And I'm happy—if you look at Claim 23 of the patent in a certain claim, it includes more than just putting a powered belt onto a sealant melter. In fact, in that claim, it gets into the details of how the splash box is configured. For example, that claim includes limitations from Claim 21, which talks about the size of the sidewalls of the splash box, which must be proportional to the sealant blocks. It also says that the block completely enters the splash box before any part of the block exits the splash box. There is nothing in anything we have ever seen from the appellant that addresses that limitation, whether it's by argument, by prior art, or anything. What's the—going back to the Chief's first question to you, I guess. What's the point of novelty here? Is it the splash box? Is it the combination? Is it the power versus the motor? What is the novelty? Absolutely, Your Honor. I believe that Claim 5 is a good example because Claim 5 adds a conveyor control assembly mounted on the inlet end. Now, in the prior art, what people were doing is they were loading the blocks into the melter from the back of a truck because the blocks have to be carried to the work site somehow. They're carried on pallets in the back of a truck. And what PennDOT was doing was they had one worker in the truck throwing the blocks down the conveyor into the— go down the conveyor. Let's use the claim—independent Claim 1 of the 375 patent. What in that is new, non-obvious, and patentable? I'm looking at it. Your Honor, we have an asserted Claim 1 against the defendants. So what is it that is non-obvious about your invention? Your Honor, what happens when you power a conveyor? It's shown in the figures of the patent. When you power it, you are able to, as you load from the back of the truck, instead of having one person go up to the truck always and roll the block down, what it allows you to do is— Stop it. Actually, yes and no. In the figure, it shows— Power conveyors were in the art, right? That's correct, Your Honor. So are you saying that no one has ever— I mean, in this invention, aren't you using power conveyors the way any person, if they decided to use a power conveyor in this circumstance, would do it? So what's different? No, Your Honor. In Figure 1, you'll see that, indicated by the letter B, are about a dozen blocks that are parked sequentially on the conveyor. Okay. And what this invention allows the operators to do— Which figure are you referring to? Figure 1, Your Honor. One. Mm-hmm. And you'll see it's hard to see if you don't look for it, but B, the letter B, refers to a block. Mm-hmm. And in this picture, the blocks are all end-to-end. Yeah. And this is discussed in the patent, too, by the way. So the novelty is that you're putting blocks end-to-end on a power conveyor belt? That's the first—this is what it allows you to do. When the worker loads the belt, the blocks are parked. They can be parked perfectly close together. The belt is full. Then that worker can leave the back of the truck, work at the work site, and then as you need the blocks, you can drop them in with the control, which is mentioned in Claim 5, which is down by the inlet. It doesn't need to be up by the truck. This allows the workers to park an entire day's worth of blocks, or at least a good number of them, and then drop them in one by one. That was something that there's—first of all, there's nothing in the record about the state of the prior art. But this is in the patent in Column 9, discusses an advantage that this powered system gives. It's not just a matter of we want to get the blocks from the truck to the melter, and a powered way is another way of doing it. What was the difference between the particular Claim 1 or the other claims in the patent and the DOT from Pennsylvania? Your Honor, the Pennsylvania process. Your Honor, it's undisputed that no system ever used a—they ever used a powered— they never used a powered conveyor. No sealant. Correct. No system just like this. Yes, there are a zillion other kinds of systems that need to get something from one place to another that use power conveyors, right? That's correct. The notion of using a power conveyor to perform this kind of task is not novel, is it? Well, Your Honor, I agree, but when you say this kind of task, there's a danger involved for the workers because the sealant inside these melters is so hot that if it touched your skin, you'd be seriously burned instantly. So there's a safety aspect. It's not just like moving rubble or gravel is what I'm saying. It's like moving snow. This system has to be designed so that from the time the block leaves the truck and is loaded onto the conveyor and it goes inside the melter, there's no chance of any splashing on the people who have to work with these blocks. None of that's claimed. That's a nice explanation. All we've got is just looking at your four and five. It's the claim one we were talking about wherein you have a powered conveyor. That's correct, Your Honor, but claim five goes on to add that you can... A manually on button. But it's located down by the inlet, which is the embodiment discussed in column nine of the patent, which points out that you can drop them in from down off the truck because you're able to park the blocks along the conveyor at the beginning of the day. I am struggling along with my colleagues to understand why that wouldn't be obvious to one of skill in the art. They certainly want to stay away from that hot liquid you're talking about, so they're going to load them a long ways away, and they're going to use their on and off switch on the conveyor. I'm trying to figure out what you've added to the art here that isn't incredibly clear to one of skill in the art. Well, Your Honor, first I'd like to say that the record as to what would be clear of one of skill in the art was the burden of the party asserting invalidity to show, and there is no such record. So I am happy to discuss it. Well, I think our cases, though, that talk about common sense, this aspect of common sense, suggests that we're not talking about experts here. If you start talking about experts in debates, then by definition it's not common sense. The common sense is something other than this. The patent office gave you a patent. Why did you get a patent for this? We're finding it hard to understand, and you've got to give us a good answer. Your Honor, I believe that the reasons that we got the patent were because we were the first to add the power conveyor, which had advantages that were not appreciated by the industry, and having a switch down by the inlet facilitates this preloading, which was disclosed in the patent in Column 9. And in Claim 23, the inventor spent a lot of time developing a splash box whereby when the block comes in, the door is completely closed before the block enters the tank. And that's in Claim 23. There is no evidence that anyone had ever tried to do that before. There is no art that suggests that it was in the prior art that the door closed before the block left the splash box. Once again, what is the difference between the patent claims and the pen dot process that was developed by Pennsylvania Department of Transportation? Your Honor, when our company first learned about this, was when they learned that people were attaching manual conveyors to our melters and sliding the blocks down the conveyor, which was causing splashing out of some kind of primitive opening with a door of some kind. Our company objected to that as a violation of the warranty and undertook to design a safer system. And the result of that was a system where the splash box is safer because the door closes before the block leaves, so there's no chance of splashing out, and the conveyor also avoids this unsafe condition of having people up in the truck rolling things down into the bottom where someone else may or may not be waiting. The invention allows one person to load in the morning, come down, work, add blocks to the melter as necessary using a safer splash box. But wasn't the splash box also considered by the Pennsylvania DOT process? Is it splash proof? Your Honor, I believe that they attempted to design something like that, but it's not what's claimed in, for example, Claim 23. There's no evidence that they had such a splash box as in Claim 23 because there's nothing that the appellants ever presented that ever discussed Claim 23. What was the difference between what the Penn DOT process and the splash box that they considered and suggested in the Claim 23? Well, in Claim 23, first of all, it incorporates the limitations of Claim 21 that the sidewalls of the splash box have to be proportional to the blocks, and it's set up so that when a block enters, the outer door is closed before it leaves the splash box. The big concern that our company had when we saw these things in the field was there was sealant all over the outside. So sealant was obviously getting out. What's claimed here, and Claim 23 is most explicit of the asserted claims, would prevent that. Your Honor, I believe that the other grounds that the district court, the infringement case and also the decisions on, I believe, the antitrust is not being appealed, but I also believe the district court was correct to find infringement under the Doctrine of Equivalence and also to dismiss the antitrust under competition claims as well. Okay, thank you. Mr. Smith? Thank you, Your Honor. Just very briefly. One, the idea for the power conveyor came from Raymond Rue at Penn DOT who viewed the athy conveyor that's used to pull broken up asphalt and dump it into a dump truck. Essentially, it goes in exactly . . . Did you present all this to the district judge in a timely manner? We did. Well, district judges don't just make commonsensical mistakes. Why did they rule against you? I frankly was flabbergasted, Your Honor. We have wonderful district judges. I have a feeling that they wouldn't make a mistake unless counsel didn't present the case to them in a way that would make it easy for them to reach the right decision. Well, I agree. I think it was unfortunate that the district court judge didn't allow for oral argument. That would have been, I think, very helpful. I think there's certainly a purpose for that. I will say, Your Honor, in response to a couple of things that Mr. The reason they got this patent is because every item which was in claim number one, which was also contained within Penn DOT's units which were in commercial use and which Mr. Barnes at page 400 of the appendix said was identical as far as the splash box is concerned. All of those claims were not disclosed as prior art. So what we have been limited here to is the power conveyor. So the question is, would they have gotten this patent had they disclosed that the only difference between what Penn DOT is using and what is being used today is the addition of a power conveyor? But that would be an obvious argument, right? Absolutely. And you did not make that as part of the summary judgment proceeding. Absolutely. Because the only, and I will let you read the motion. The word obviousness is not contained in their brief. Not. Now, he also said that they spent a lot of time on this. Remember that the idea on, especially related to this power actuator that we're talking about that's so important at the melter end of the conveyor. Again, that's an idea that came from Penn DOT. It's contained on page 337 in Craftco's October, November 6th letter. This, of course, is also, as you recall, this is Mr. Barnes' invention. Mr. Barnes went to work approximately 15 days before this and said he didn't even work on this project until February of the following year. So what we've got is we've got the identification of this all-important actuator having occurred months before the inventor even goes to work on the project. And the first discussion of the power conveyor that this invention, the importance of this invention by Mr. Barnes, occurs on October 6th, or excuse me, October 3rd, which, of course, is 15 days before he even takes the job with Craftco. Your Honor, the conversion from a roller conveyor to a power conveyor is as judgment should be overturned as well as the arguments related to infringement and inequity. Thank you. Mr. Smith, the next case is Citigroup v. Capital City.